PHILADELPHIA TRANSP. & LIGHTERAGE CO. v. MECHLING BROS. MFG. CO.

(District Court, E. D. Pennsylvania. March 26, 1908.)

No. 75.

WHARVES—INJURY TO VESSEL—OBSTRUCTIONS ON BOTTOM.

The owner of a lighter, which sank by the stern and dumped her deck load while lying at respondent's wharf, *held*, on the evidence, to have failed to establish the allegations of its libel that the accident was the result of injury received from obstructions on the bottom at the berth; there being no evidence of a hole or leak in the bottom of sufficient size to account for her sinking.

In Admiralty. On final hearing.

Horace L. Cheyney, for libelant.

Preston K. Erdman and Alfred Driver, for respondent.

HOLLAND, District Judge. This action was brought to recover damages for the injury sustained by a barge belonging to the respondent, alleged to have been sunk along side of the respondent's wharf on Cooper's creek, Camden, as a result of striking some rocks in the bed of the creek within the limits of the berth. The respondent, on March 27, 1903, contracted with libelant to carry 200 tons of kieserite from the steamship Arcadia, lying at Philadelphia, upon a deck lighter, to the wharf of respondent on Cooper's creek. The lighter employed is about 108 feet in length and 23 feet 6 inches wide. The cargo was loaded upon the deck of the lighter the entire width, in three heaps, about 7 to 8 feet high, and occupied the entire width of the vessel. The hold, which was about 7 feet in depth, was empty. With her cargo so stowed, the lighter was towed to a point within about 400 feet below respondent's wharf in Cooper's Creek, Camden, where she lay, head upstream, arriving there on Saturday afternoon. Cooper's creek is abou. 60 feet. wide at the place of the accident. It has a depth of 10 to 12 feet in the middle, with sloping sides at the bottom. At this point it makes. a curve, and the respondent's wharf, with a frontage of about 200 feet, and R. D. Wood & Co.'s wharf, which lies immediately below that of respondent's, adjoining it at the lower end, are on the outer side of the curve. A fence divides the two properties, and a willow tree stands close to the fence on the respondent's side, about 8 or 10 feet from the creek. The lighter had a mast amidship, used in hoisting from the hold.

The next day (Sunday) the master met one Sims, who said to him: "I would not go down along the wharf. The tide falls low down here." To which the master replied: "I was there at 5 o'clock this morning, and sounded, and know all about it." He subsequently, on Sunday morning in the presence of respondent's superintendent, sounded the bottom opposite the respondent's wharf, to find, as he said, "if it was a safe place to lie there." The lighter then lay with her stern made fast to R. D. Wood & Co.'s wharf, sufficiently close for a person to step from the stern of the lighter to the wharf. A line was run out from the bow and made fast to a tree on the extreme upper end of the wharf of respondent, with her bow more than 10 feet out in the creek. About one-half of the lighter was off the wharf of the respondent, and the other half was opposite the Wood Company's wharf. About 10 o'clock on Sunday evening the pumps were tried and no water found. About 1 o'clock Monday morning the master was aroused and found water coming down the hatchway into the cabin. He discovered the boat was sinking, and, after an attempt to start the pumps, he, with the others on board, jumped ashore, and almost immediately the lighter careened inshore, and her deck load was dumped into the water. She then righted, her stern, however, remaining down; but the bow was out of water. The lighter was subsequently shifted, and lay on the bottom of the creek until Wednesday, when she was raised and taken to the dry dock for repairs. There were some marks found

on her bottom, but no hole, and the chime seams somewhat open. There were limbs of the willow tree on her mast, which showed that she was, as claimed by the respondent, lying about equal portions of her length in front of the respondent and the Wood Company's wharf.

There was no water in her hold at 10 o'clock, and it was high tide about 1 o'clock, when she careened. At this time water was pouring in her hatches at the stern, and her stern was down. If she had rested on any submerged obstruction in the creek prior to that, and had been twisted, as claimed, so that the chime seams had opened and permitted water to leak in, there certainly would have been some evidence of it at 10 o'clock, when the master tried the pumps but found nothing to indicate a leak. The burden of affirmatively proving the negligence on the part of the respondent is upon the libelant, and in this we think they have failed. There is nothing to show that the sinking of this lighter was the result of injury received from an obstruction at the berth; but the fact that it careened inshore, then righted itself after dumping the load, and the fact that there was no evidence of a hole or leak of sufficient size to account for submerging the stern, as found by the captain when he awoke, all tend to show there was some other cause for the accident than that of a leak caused by reason of an obstruction in the bottom of the creek.

It is not necessary to consider the question as to whether the attempted explanation of the respondent, which was not pleaded, to wit, that the stern of the lighter caught on the wharf of Wood Company, and as the tide arose gradually became submerged, because as we have said, the libelant failed to establish affirmatively that the cause of the accident was as set forth in the libel, and therefore the libel is dismissed; the costs to be paid by libelant.